oral argument not to exceed 15 minutes aside. Mr. Shiles for the defendant. Thank you and good morning. I am Gene Shiles. I represent the defendant and the excuse me, as this court knows we have four issues before it. I'll probably only talk about three. Obviously I'm not waiving anything, but I will try to put my time to its best use. Mr. Cardin, as I said, as the court knows, this did go through a jury trial, but Mr. Cardin is quite insistent and his first primary and principal issue is that there was insufficient evidence to convict him. Now this was a long trial and as the court knows this had to do with fraud, and of course the standard of view is very clear as maybe somewhat different from the previous case. We know what the standard of review is and it's a difficult one, a very difficult one. But he says that no rational trier of fact would find all the elements in this case and in particular he says that there's no evidence or there's no sufficient evidence to find that number one there was a scheme and then number two, which could combine a couple of facts actually, that there was no intent to defraud, to misrepresent or to otherwise take actions which would contribute to this purported scheme. And what Mr. Cardin emphasizes in this case is a holistic view obviously and what he says under this context the jury just simply couldn't rationally find all these elements. Why not? Well, what he comes in, Mr. Cardin comes in from a different employment and he comes in with new responsibilities. That's all before the jury, right? It is. Yes, sir. It is all before the jury. Is that enough to say the jury came to the wrong conclusion? No, sir. It's not. It's not. But this court can exercise, this court does obviously exercise and have the authority to exercise oversight over even jury and that's why we have But we have to conclude that no reasonable juror could come to that conclusion. It's a tough test. Yes, sir. A tough test. It is a very tough test. I mean, don't you have to come up with an argument that's more than if you were a juror, this is what I would argue to you? Well, there has to be something that just a juror couldn't believe, right? Well, that's right. Is there anything like that here? Yes. Well, Mr. Cardin certainly believes so and he argues, there's a number of things. The first thing I would probably, and maybe I'll start from the bottom and then work my way up. The first thing is when you look at Nancy Holloway, who's an OIG inspector, comes in and questions Mr. Cardin along with a couple of other representatives of S&W and what she says I think is very enlightening. She says that Mr. Cardin is very confident, her word is cocky, and he explains how he approached all these matters and was very confident in what he did. He wasn't embarrassed, he wasn't cowering, he wasn't scared. In fact, she probably, this is not I infer from it, that she actually took some offense that he was so, because she called him cocky and I think that is probably a pejorative phrase that she is using. Well, he thinks he knows everything. In fact, I think she even says that. So I would start with that. Here's somebody that doesn't find any, who doesn't believe he's done anything wrong and he's sitting there and explaining it to the OIG, who certainly has great law enforcement powers over him and could put him in a world of hurt and in fact, ultimately, that's exactly what happened. What we do when we then go back, Your Honor, Judge Rogers, and look at the facts and as the testimony was developed, he came from a different employment. He had not done these OIG inspections before or classifications and he came into a program that was already set up by SNW and they had a particular type of model, it's called the transitional duty model, where you try to get these employees back into work as soon as possible. Now, that in of itself does not dictate any of the decisions, Judge, and I'm not arguing that it does. What I'm saying is it sets up an intellectual framework and that he's gone into a model that he is just implementing from SNW. And plus, not only has he not had this experience before and not only is he placed within a model, an existing model, that was developed by his employer, but he has certain individuals that are exercising oversight and have a lot of experience in this area. That would be Mr. Chin and whoever the occupational physician who is trained in occupational health is in this particular case. So these people are exercising oversight of his work. Plus, not only is it some, and I'm sure Mr. Popper will say that Mr. Chin is in Boston, but on one to two occasions each month, Mr. Chin, as the testimony relates to us, came down and did a personal inspection of at least some of the files. Plus, once Mr. Cardin is installed in this program, this pre-setup program, with the oversight of these two knowledgeable individuals, there are two TVA audits, and we know that, of course, is the victim in this particular case. And two TVA audits actually find that there's no problem. There's no problem in the way that this particular program is being implemented and in particular Mr. Cardin's contribution to it. And in fact, one of those TVA audits had to do with complaints that was raised by Ms. Cashin. Now Ms. Cashin ends up being a witness in this particular case and testifying for the government. But what does Mr. Cardin know at the time? What Mr. Cardin knows is there's been two TVA audits, the complaints made by Ms. Cashin, who will ultimately be a witness, and they find no problems. He gets a clean bill of health. In his terms, the results were glowing terms and there were no complaints. So those were the, and plus, so that is the context. And then to go one step further, and I think this will kind of wrap up this particular issue, and there may be exceptions. Let me just say that right up front. But as this court knows and as these poor law clerks know, there was a lot of witnesses. There was a lot of testimony. But by and large, and to a great extent, the government concentrated and objected to the conclusions, the classifications that Mr. Cardin ended up with. But when he goes through the classification document, when he states the facts, by and large, with few exceptions, there are some exceptions, but with few exceptions, the facts are correctly related. He'll talk about somebody slipping and falling, but then he'll conclude, well, and this, of course, gets to the gist of the problem. He had really the wrong understanding of what an OSHA reportable incident was. In truth, in reality, it tracked pretty closely to a workers' compensation situation. If you fall, you get hurt, if you should report workers' compensation in all candor, you've probably got an OSHA reportable incident. He thought at the time, he testified also at trial, and there was at least one individual, I think, that testified to this fact, that he all along thought that there was a difference in those two standards. Now, as I look at it as an attorney, in retrospect, frankly, in all candor, I don't see a great difference. There could be exceptions. I don't think there would be many. But he certainly had that, and when you look at all of that, and this court exercising its oversight authority, even over jury trials, when you look at all of that, Mr. Cardin strenuously argues that there was just insufficient evidence to find him guilty of a fraud. Now, his second issue is the appointment of counsel, and to the government's credit, the government brought up a concern that it had because counsel for Mr. Cardin was being paid for by his employer. Pursuant to that arrangement, there was an agreement, and in that agreement, it stated that basically that the payment of counsel was contingent that there would be no conflict of interest between the parties. Not surprising. I'm not saying that's a particularly surprising thing, but what Mr. Cardin argues is that what it failed to do in failing to relieve this particular counsel at the time when the government filed the motion and when Judge Collier found that there was a high probability that there would be a conflict of interest is that it set up this case for failure because, as I've explained, or hopefully explained to this court, when one looks at the circumstances, this case can only be understood in its overall context of a strategy by S&W. Now, Mr. Cardin is not saying necessarily that S&W had any criminal intent, but what he is saying is that in failing to relieve counsel, we'll never know. Those aspects of the case that might show, or in particular show, just how the S&W's approach to this were never explored, and that's something he thinks that was to his detriment. And then finally, I'll probably talk about just the third issue of four, and that is even in light of that whole situation and even if the court finds that those first two issues do not have merit, he further argues that his sentence was unreasonable. Now, I will tell you that the guidelines for these particular offenses was 78 to 97 months. Judge Collier picked the low end of the guideline range, which was 78. But nevertheless, he believes that under the circumstances of having no criminal record, which was noted. I mean, it's not like that was overlooked. That was obviously in the PSR. But putting the proper emphasis with his background and with all the 353 factors, especially in the sense that even if one finds culpability that this particular individual did not gain financially. And that was a finding by Judge Collier, which is noted in my brief. And while normally this isn't taken into account, all losses were paid back to TVA by the employer. And this individual also suffers the further detriment of not being able to practice, obviously, even when he's released. I see that my time is up. Is there questions? Your brief has about 90 pages of description of these various determinations. Yes. Could you identify one or two of them that would help us the most? Yes, sir. I think I can. Probably. And here's one. Yes, sir. Of 29, I think it's 28 and 29, Eugene Lacey. And what is the point? What will that help show us? Yes, sir. What I think would be relevant in that one, Your Honor, is that this is one where originally, and I think it's 28 or 29. Paul Jackson is on page. It's real close to there, Your Honor. It's probably in the 20s, I think. Okay. Well, what's the name? Eugene Lacey, L-A-C-E-Y. I just looked it up, so I thought I had the right page number. Forgive me. Now, with respect to Lacey, what's so strong about that? Well, yes, sir. What happened is Mr. Cardin submitted a COD classification document. First, on the first instance of claiming vetted. I know your time is up. Is it that in Mr. Lacey's case it was really somebody else who made the decision? Yes, sir. Now, that one doesn't happen very often, but it appears that Mr. Chin changed the classification from reportable to vetted. Yes, sir. Any other questions? Apparently not. Thank you. Thank you so much. Appreciate it. Thank you. May it please the Court. Just need one second. Yes, sir. Thank you, Your Honor. May it please the Court. Perry Piper, Assistant U.S. Attorney in Chattanooga. Mr. Shiles has discussed three issues here today, and I'd like to briefly address those if I might. With respect to the insufficiency of the evidence, certainly there was, as Judge Rogers has noted, Mr. Shiles has written, I think, 90 pages of these classifications. If you could just pick the one that he picked. And I was looking for Mr. Lacey. Actually, I think we brought this out at trial, Your Honor, that there was a draft determination of classification where Mr. Cardin, the defendant, stated that it would be a recordable injury and then it was later changed. Of course, Peter Chin was the defendant's boss, and even conceding, assuming for the sake of argument that it was Peter Chin who changed it without any input from the defendant, that would be one out of 80 that would have been changed by someone else. I think the more egregious examples, the one that is my favorite, is the last one I include. Randy Harris is a gentleman who had fallen. He was eight stories up. He was a big man, 300 pounds. They put him on one of those backboards, lowered him down eight stories, carried him over to the safety trailer where Mr. Cardin saw him. And this is Mr. Harris testifying. Mr. Cardin asked him to walk, and he said, I can't walk. They take him to his car. Cardin says, we'll deal with it tomorrow. He comes in tomorrow, still got the same broken leg, and Mr. Cardin says, well, it happened after work at night. So that's pretty egregious, but would that have justified all of the counts, or that's just one of the counts? No, sir. That would not have justified all of the counts, and that's the reason why I think we called 80. We put on proof of it. How many counts were there? There were six counts, Your Honor. I'm sorry, that's not true. Eight counts. It was 2004 to 2006. Three different nuclear power plants, but at Wattsboro we did not include 2006. The counts went by? By fiscal year, yes, sir. Fiscal year at three different nuclear power plants, Wattsboro was the last one we didn't include 2006. Having said that, I think one of the reasons we called 40 live injured workers and then 40 what we call dead files, people that were not there to testify, but we had Agent Thomas testify to them, and they were from all of the nuclear power plants and all of the fiscal years, and in virtually every one of those, and even the one that Mr. Shiles talks about, Mr. Lacey, I think may have been a grinder accident, but there are numerous cases where these people were always injured on the job. This is hard, heavy construction work, as the court can imagine. Nuclear power plant construction is probably some of the most industrial strength construction going on, and it just is a sad fact of life. Under the OSHA standard or under any standard, people are going to get injured. They have to have zero defects or zero injuries in order to get the bonuses? There was a different contract. Praise be to TVA, Your Honor. They change the contract every year, and it's a percentage of— To make things easier for you. Yes, sir. That's exactly right. They wanted to make it very easy for an underappreciated AUSA to try this case, but the contracts were different. When we put the contracts in, there was a percentage, generally, of what you could either have as a lost time accident, which is the more serious or egregious accident, or a recordable injury, which is the injury that basically is anything beyond first aid. If you have a piece of metal in your eye and you have to have it— How many typically are for the average one of these contracts? You get to have a few injuries? Yes, sir. It's a percentage. That TVA negotiates under the OSHA standard. What he's doing, according to the government's theory, is he's keeping the percentages down so that they can get— It's not like one injury means you lose on a million dollars or whatever. No. Well, at some of the— One lost time may have precluded them, say, at Sequoia or Watts Bar. At Browns Ferry, which was the restart, the new construction of the dormant nuclear power plant, they would have been permitted to have more than, say, one lost time injury. But lost time injuries are pretty serious under the OSHA standard. I think the big issue in this case is that TVA and Stone & Webster have incentivized safety reporting. But I just thought there was a little tension between the idea that the contractors thought that zero was a possibility, and you're saying this is heavy industry, there have to be accidents. Well, and the contractors accept that, and we're only talking about the safety bonus. They're getting paid regardless. You're talking about the safety bonus. Yes, sir. The safety bonus, it's actually possible to— Oh, absolutely. It is possible to make, but— In those zero injury situations, it's possible to manage and get zero injuries. It's possible to get zero lost time. I think for recordables, they would be given five or ten— I'm sorry. I apologize to your honor. The light bulb has popped on as to what the court was asking me. They could be given recordable injuries. I think on one of the contracts or two of the contracts would have been for the lesser construction outages, they were either giving zero or one lost time injuries. But for recordable injuries, the number would have been far higher, 20, something like that. People get cut. People have— That stuff happens. Yes, sir. Yes, sir. Anyway, the defendant has generally— Pardon my colloquialism. The defendant has generally agreed that the people are injured because it's hard to hide an injury. But virtually every time, he would say the mechanism of injury does not suggest that the injury is work-related. When in fact, that's why we called 40 live witnesses to come in and say, no, I broke my hand drilling something. I grabbed this chain fall, a pulley, and it pulled my arm out of socket. And I walked over to the safety trailer, and Mr. Carden treated it with ice and ibuprofen. And then later on, they have $100,000 worth of surgery for which TVA is self-insured under workers' comp and is paying for, and Mr. Carden is fully aware of this because we have all of these emails and letters between him and the— Is the standard of duty for workers' comp purposes the same as whatever the standard is? OSHA standard 1904, Your Honor, it's very, very similar. And virtually the same as far as Mr. Carden would be concerned. It's extremely similar. That's one thing— Is it unusual or impossible or occasional that you might have one but not the other? It might be covered under workers' comp but not be recordable. It would be very unusual in my opinion. Your Honor, I'm a meth prosecutor by trade, so I don't do workers' comp, unfortunately. According to the record. Yes, sir. I think it's very—as a matter of fact, we had the workers' comp people testify and we had other OSHA safety people testify, and they all stated the same, that the standards are very similar. It's a work-related injury. It can happen in the parking lot, things like that. But with respect to the sufficiency of the evidence, the evidence showed that Mr. Carden repeatedly lied about the mechanism of injury, not the injury itself but what caused the injury. And the only reason why I point out Mr. Harris, it was the most absurd one to me, and that's why I saved it for last in the brief. But we also had 40 of the other five. The hernias, he would always say, a guy's trying to hold back a 500-pound buggy loaded with this heavy equipment and gets a hernia, and Mr. Carden says, oh, a hernia is not caused by physical exertion. And he even testified to that in trial. So many of those are present in the record. And we did not recount them all, as I stated, and as Mr. Shiles has done an excellent job of recounting virtually every injury, we felt like we wanted to make our brief less than 129 pages long. With respect, he had sufficient awareness that the safety fee was tied to the OSHA standard. When we asked for that information, he forwarded it to a fellow named Dave Hastie, who worked for TVA, who forwarded it to Agent Holloway. We found the contracts in his desk drawer showing what the safety fee was, what the percentage was, and he was also copied on some e-mails. A fellow named Les Collingwood testified at trial, and Mr. Carden told him that we weren't going to have any recordables on this job, in other words, any injuries that were beyond first aid. And Les Collingwood, who'd been 35 years in the construction business, said, you're crazy, there's federal money tied to that, you're going to go to prison. This all came out at trial, and Mr. Carden denied that. But it's certainly within the province of the jury to believe the witnesses, and a rational juror could have found him guilty with respect to that. Real quick, last thing, the defendant likes to blame Mr. Chan. He came down and did an inspection of the files, and there were these audits where they did an inspection of the files. And that was the beautiful thing about this fraud, is that if you're just looking at the files and Mr. Carden's saying, well, the injury happened at home, then you would think, oh, everything's okay. But then when you go out and talk to Randy Harris and say, after you fell and they had to carry you down eight stories, did you break your ankle at home that night? And he starts laughing, you know that somebody's cooking the books, and that somebody was Mr. Carden. That was a scheme to defraud. The idea that it's really his superiors who were at fault ties into the question of whether there was a conflicted counsel. It does tie into that question, Your Honor. And we saw this contract where Stone and Webster Shaw Group was reimbursing Mr. Gardner for his representation, and we bring it to Judge Collier's attention. We had a lengthy hearing on it, and we were sufficiently concerned that the biggest thing I was concerned about that we were going to be in the middle of this three-week trial and Judge Collier was going to find out about it and realize that I hadn't brought it to his attention. But the second biggest thing I was concerned about was the fact that I didn't want Mr. Carden to come back later and say I had conflicted counsel because he was being paid by my employer, who I wanted to dump on. I wanted to put everything on him. Judge Collier grilled him on this and says, if it turns out bad, are you going to come back here and complain? And he says, well, I can't promise I won't complain, but I understand the choices and I've made my choice. I don't believe that Mr. Gardner was indeed conflicted. He was being paid by Stone and Webster, but he was not answering to Stone and Webster in the sense that he was not coordinating with Stone and Webster or taking his lead from them. In fact, the testimony at trial established or tried to establish that Peter Chinn or Dr. Gauthier, the people who were either contracting with Stone and Webster or employed by Stone and Webster, were responsible for some of these. I think that sufficiently rebuts the claim that Bruce Gardner may have had a conflict. I think these indemnification contracts, as Judge Collier noted, are common, that people who are employed, if you are indicted or if you're sued, your employer will in fact pay for your lawyer. I've never had such a job, but my point is, hopefully I won't need that, but my point is that Judge Collier found that they're common and that was the thing about the integrity of the judicial process. He said that these are contracts that should be favored and we should encourage employers to do that. So I don't believe that there was really any actual conflict. There was a potential conflict that we noticed. Do you ever send government officials sued in their individual capacity sometimes? Do I? Or your office? Our office does, Judge. Do you have some sort of consent documentation for that as well? There's no question. Absolutely. We would have a, you know, and I think that if AUSAs are sued, we can get DOJ counsel perhaps, but I represented a postal worker years ago, Judge, on a criminal case as an AUSA. It was kind of neat. With respect to the last issue, we've addressed the appointment of counsel with respect to the last issue. The sentence was 78 months. It was 78 to 97 was the guideline range. And Mr. Cardin, I told the district court this, Mr. Cardin had much to commend to himself. He'd been a working man his entire life and indeed, as what Mr. Shiles says, I'm almost out of time, but Mr. Shiles says, is Mr. Cardin didn't make a lot of money on this deal, although he did double his salary at the time he worked at Stone and Webster and he got a slight bonus, I think, $1,250. But recently fell at a shipyard, I think, in Portsmouth, New Hampshire. Didn't want to work that day and he set fire to a submarine thinking he could get off that day and the submarine burned completely and the Navy's out $600 million. So the motivation was slight for the shipyard worker and the motivation for Mr. Cardin was greater than that. He knew that he was moving up the corporate ladder. We put proof on this at trial. He testified to this. Yes, I was trying to get ahead and he billed himself as the OSHA expert, as the recordable expert. I'm going to keep your recordables down, which he did. He was right about that, but he did it fraudulently. So even though he was not the one who earned all the money, I think Judge Collier looked at the ultimate harm in this case, which was significant. It invalidated much data from the safety folks, the safety engineers, and I don't believe the court made any error in imposing a bottom of the guideline range sentence. Thank you very much. Thank you, Mr. Piper. Mr. Shiles, you have... Yeah, Your Honor, I only have one thing to state and that is back to Judge Rogers. Judge Rogers, I do find that on page 29 is the insert about Mr. Lacey. Other than that, I have no further comments. Okay, counsel. Thank you for your arguments today, and Mr. Shiles, I believe you've taken this case under the Criminal Justice Act, and that's a real service to your client and to the system at large. We want to thank you for that. Well, you're very much welcome, and if I may respond, I hope I did not, and I'm quite serious about this. I undertook this brief with a lot of thought, and I hope I didn't overburden this court or the law clerks. I thought it really was my duty to explicate all that went on at trial, so I hope I met my duty in doing that and didn't put you to too much trouble. Thank you very much. Appreciate that. Case is submitted, and you may call the next case.